Mr. Roberts. Thank you, Your Honor. Good morning and may it please the Court. This case centers on the question, what constitutes an available appropriation for the economic and impact assistance payments the Department of Energy was required by statutes to provide to the line item appropriation specifically for the assistance payments was required for there to be available appropriations and because there was not one. In Maine community, the Supreme Court's decision recently, they've told us that the language subject to the availability of appropriations is limiting. What do you understand to be the limiting effect of that language? Yes, thank you, Your Honor. It limits it to just that available appropriations. It cuts off other sources of funds, maybe collections, other specific funds that Congress has enacted. But the question remains, what is an available appropriation? In effect, that's the second question that this Court asked in Greenlee. The Supreme Court recently just basically confirmed the Greenlee County analysis. And so the question is, what is an available appropriation? And the simple and undisputed answer is that an available appropriation for a proposed expenditure is one that can be used for that expenditure in compliance with the purpose statute. And in applying this purpose analysis, there was no appropriation for this purpose, right? There was. There were appropriations for the material disposition program. The law has never been that for there to be an available appropriation, there has to be a specific line-item appropriation. Congress does not and could not reasonably fund all future expenditures of an agency through line-item appropriations. The Court of Federal Claims accepted that, and so does the federal government. The general proposition that you do not need a line-item appropriation. What you do is you look at the specific appropriations that were available, and you determine, according to the GAO, the Government Accountability Office analysis, whether those appropriations had a logical or reasonable relationship to an authorized function or the expenditure of the federal agency. This is the necessity doctrine that you're relying on? Yes, General. It's a plain language interpretation of both relevant statutes here, Section 2566, as well as the relevant appropriations act. I'm trying to figure out what the contention is here. Is the contention that this fits within the necessity doctrine? Yes, Your Honor. Yes. That the material disposition program appropriations, which are set forth in the explanatory tables of the relevant appropriation acts-there's a line there that states that the relevant appropriations are available for the authorized function of the assistance payments. Congress, through Section 2566, made the assistance payments an authorized function and obligation of the Department of Energy's disposition program. If you look at Section 2566, if you look at the title, it's, quote, disposition of weapons used with plutonium at the Savannah River site. You go through this body of section... They can make the disposition of the materials without paying these amounts to the state of South Carolina, right? That doesn't assist them in making the material disposition. I will concede that the payments themselves do not assist in the actual processing of the plutonium, but here we're looking at whether they assist the Department of Energy in their disposition program as a whole, whether they have a reasonable or logical relationship to the disposition program as a whole. And here Congress answered that question. It enacted Section 2566 and all of those obligations in furtherance of the nation's disposition policy. I mean, here what the government is saying is, I think they essentially concede that statute was enacted, as they must, in furtherance of the disposition program, but now when the state comes to enforce those obligations, those obligations have nothing to do with the disposition program. And just respectfully, we think that's absurd. Congressman Wallach, there's an alternative for the United States to paying those funds if they're required, and that is to move the radioactive material out of the state of South Carolina. Am I correct? Correct, yes. What funds would be used for that movement? Well, the Department in later years used material disposition program funds to move the plutonium outside of South Carolina. So that relates to another litigation the state was forced to bring, and that was related to Subsection C of Section 2566. We obtained an order requiring the Department of Energy to move one ton as required by that section outside of the state. After the Fourth Circuit affirmed, the Department of Energy did in fact remove that plutonium. They shipped it out to Nevada, or the majority of it out to Nevada, and in their budget request, they said they were using material disposition program appropriations to do that. So the government, through its actions, has at least conceded that those appropriations have a logical or reasonable relationship to Section 2566 obligations. Council, that's Nevada, not Nevada. My apologies. My apologies. So after that, was the entire deposit of the residual plutonium moved out of South Carolina, or just that one ton? Just that one ton, Your Honor. That was what that previous lawsuit and what Subsection C of 2566 required. The plutonium that the Department could either remove or pay the obligation, that plutonium is all remaining in the state of South Carolina. So by making that decision to store the plutonium in South Carolina, the Department of Energy, knowing that the effect of that decision was to obligate the assistance payments, the Department made that decision, obligated the assistance payments, and that plutonium is now stored. So as we say in our brief, the payments are in essence the storage costs, the statutorily mandated storage costs, or rent, of the Department of Energy continuing to store that plutonium in South Carolina. And they did that for a reason that furthers their new disposition. What do you mean rent? They're not renting any property from the state of South Carolina, right? South Carolina has no ability to prevent them from processing uranium in South Carolina, right? We do not have the ability to prevent them from doing so. When we use the term rent, it's more of an analogous way. We're saying that Congress gave them a choice. You either can store the plutonium in South Carolina and make the payments, or you can remove it and you do not have to make the payments. And that's the choice. They, the Department of Energy, decided to stay in the state of South Carolina, and the cost of that decision are the assistance payments. And they made that decision, as I just mentioned, because it furthers their current disposition policy. And that is, they want to, what they call, dilute and dispose. And that initial process occurs in South Carolina. So, not only was this statute enacted in furtherance of their prior preferred disposition policy, and those obligations imposed in furtherance of their prior disposition policy, their current decision is now to store the plutonium in South Carolina is in furtherance of their current disposition policy, after they failed to build the MOSFET facility. Counsel, this is Judge Wallach. The specific language at issue here, subject to the availability of appropriations, was injected into the statute at the request of a senator from South Carolina. What does the record show was the reason for that change, that limiting change? Your Honor, frankly, there's not much in the record or that I've ever been able to find for the reason for that change. Some of the legislative history and what the Court of Federal Claims found that it was done as a technical correction. For purposes here, our position is it does not matter. We have always, you know, believed that we had to prove that we fit within the current language, and that is subject to availability of appropriations. There must have been something there, but I couldn't find it. Your Honor, I've been dealing with this case for several years and have not been able to define it, but we really think that's somewhat of a non-issue here because the language, what is in the current statute and what we're attempting to enforce is clear and is used in many, many statutes. As the Maine Health decision, the Supreme Court recognized that decision, that language is commonly used. We don't believe the language in 2566 means anything different than how it's commonly used. Your Honor, in the way it's commonly used, it's restrictive. There has to be an appropriation for that item. And that's why I respectfully disagree with you, Your Honor. It says available appropriations. It does not say available appropriations specifically for the assistance payments. And the common understanding of what constitutes an available appropriation is if it can be extended without violating the purpose statute, whether there's sufficient appropriations that can be extended without violating the purpose statute. And here we have identified that specific appropriation. That is the material decision. Yes. Counsel, this is Judge Wallet. In the red brief at 2223, the United States argues that because of the text of 2566 D1 and the appropriation statute answer the question of whether the funds were appropriated for the assistance payments, the inquiry ends there. And you argue that the necessary expense rule should be considered. You mentioned that previously. Has the necessary expense rule ever been used to justify the kind of high dollar expenses that you're now seeking? Yes, it has. It was used actually by the Government Accountability Office in the Moda case. So if you recall what started that case was a GAO opinion saying that for the risk quarter payments, a more general appropriation was available to pay for those risk quarter payments even though Congress did not give a specific appropriation for those payments. The risk quarter payments I think for that year at issue were in the number of billions. Of course, Congress has now approved a judgment of over $12.5 billion out of the judgment fund when there was no specific appropriation. So I think the issue of what is the amount... Wasn't in that statute a subject to availability of appropriations language? There was not, but what GAO was considering was the question of available appropriations. That was the question presented to GAO. That's the question commonly presented to GAO. And when they look to determine what is an available appropriation, they look at the plain language of the statute and they look at the necessary expense doctrine. And here, both the plain language and the application of the necessary expense doctrine confirm that the material disposition appropriations were available for the assistance payments. And that's all that needs to be done. There does not need to be, and it's never been the law, there has to be a specific line item appropriation. And I believe the government conceived that as did the court of federal claims. What language of the statute covers this item as an appropriation? The appropriation, the most specific language that the Congress used was it gave appropriations for the material disposition program. Here, section 2566 was enacted as part of and imposed obligations upon the Department of Energy as part of their plutonium disposition program. So Congress has answered the question here through the operative statute, through section 2566. The Department of Energy may disagree, but Congress has said these payments along with all the other obligations further our disposition program. We're going to enact them. And so when now South Carolina comes to enforce those obligations, those obligations still relate to the plutonium disposition program. I believe my time's up, but I'm happy to answer any other questions. I see any more questions at the moment. Mr. Roberts will have rebuttal time. Thank you. No, thank you. All right, then let's hear from the government. Ms. Hogan. Good morning, Your Honors. May it please the court. In the event that the MOCS production objective was not met, Congress limited the Department of Energy's liability for economic and assistance payments by using a specific term of art with a specific meaning. Any payments were subject... Ms. Hogan, this is Judge Wallet. In the blue brief at 32 footnote 8, South Carolina's government says that it doesn't know if the DOE would remove the plutonium for each year. I asked a question, and the response was, well, they have removed it rather than pay us for one year. Are you going to keep removing it? Your Honor, I don't have... I'm not able to answer that on behalf of the Department of Energy, what the statute actually requires, because I think it maybe hasn't been fully explained. In subsection D1, the obligation to pay the economic and impact assistance payments subject to the ability of appropriation continues until, quote, the later of the date on which the MOCS production objective is achieved in such a year or the date on which the Secretary has removed from the state of South Carolina in such a year at least one metric ton of defense plutonium. The obligation, which again is contingent on the availability of appropriations, would only cut off once the later of those two events are met. Since there's no question that the obligation hasn't been met, will not be met in light of the discontinuation of the construction of the facility, that is really the issue here. The issue is not, you know, does DOE have a choice, it just removes, or to pay. It's really the statute is written in a way in which the obligations continue until the later of the two events are met. I got it. Thank you. As we have explained, and as this court has explained, subject to the availability of appropriations is, quote, commonly used to restrict the government's liability to the amounts appropriated by Congress for this purpose. This court has said that in Prairie County and Greenlee, and the Supreme Court's recent decision in Maine Community Health only confirms that those obligations are limited either by an appropriation that's provided by Congress or often with respect to a specific amount. They argue that the material disposition appropriation covers this. Could you address that question, please? Sure. Let me answer that directly, and then I'd like to back up and provide more of an answer. Essentially, there's no evidence in any of the appropriations legislation that Congress intended any of the material disposition control line appropriations to be used for making assistance payments. Isn't there a definition of what material disposition is? Well, right, material disposition as what the DOE explained that it would be using the money that Congress understood it was appropriating money for. As we explained in our brief on page 25 is disposing of weapons-grade plutonium and uranium, working with Russia to dispose of surplus weapons-grade plutonium under the U.S.-Russia plutonium disposition agreement, and directing international plutonium management. Nothing in there says anything about assistance payments to South Carolina. That's relevant in light of the fact that, as we've observed, and there's really no dispute, Congress exercises unusually specific control and direction over the nation's nonproliferation activities. And so the appropriations that are made to the Department of Energy are very specific. They are not the sort of what you may often see with unrestricted funds in furtherance of the purposes of the agency, language like that. Through the use of these explanatory statements in the tables, Congress has told DOE how it may use its funds and what amounts it may use its funds. And that fact, combined with the fact that there's no specific appropriation for economic and assistance payments, really demonstrates that Congress did not make any specificity with which Congress restricts DOE's use of funds, and in particular with respect to material disposition. But weren't they actually sufficiently specific to say that we're going to build this plant that's going to convert the plutonium into something for peaceful uses? Or, alternatively, it's still South Carolina's problem, and this is how we're going to compensate the state for filling the gap unless or until we proceed and succeed in its construction, which has now been abandoned. So trying to get a fix on what this is really all about in terms of the obligations, undoubtedly there must be heavy continuing costs to preserve the remaining large amounts of radioactive plutonium in the state. And isn't the fundamental question that of absorbing those expenses? I think the expenses of storage, the overhead that is involved in the construction of the facility, securing this material on the federal facility, are costs that are borne entirely by the federal government and the taxpayer. I think, again, it's important to go back to, and I want to strongly disagree with the characterization of the assistance payments as any kind of storage costs or rental costs. They simply are not. This is Judge Wallach. What was the purpose of those payments? The purpose of the payments, and this is from the 2005, some of the 2005 legislative history that's referenced on page 6 of the trial court's opinion, but essentially it was reassurance. It was reassurance to the state that it would not become what it feared to be a permanent dumping ground for the nation's plutonium material. And so the inclusion of the assistance payments in the statute was a political compromise to the state of South Carolina to ensure that there was congressional oversight and a mechanism to keep DOE on the right path. Ms. Hogan, that brings up what I asked your opposing counsel. Why did the South Carolina delegation make that change? It must have been something to benefit them. Your Honor, I think, again, as best as we can see, what Senator Graham said about the 2005 was that it was intended as a technical correction. Was there a proposal to repeal the provision entirely at that time? Not to my understanding. I think some of what happened in 2005 and subsequently was that the statutory deadlines for meeting the certain milestones were revised into the future. So there was this technical correction that was made to subsection D-1. That technical correction was not made to subsection D-2, which refers to the Secretary's obligations post-2022. That portion of the statute continues to use what the trial court characterized as broader language from funds available to the Secretary. To answer the court's question, we don't have any more insight into why that change was made. What we can say is that given Congress's use of very well-understood language, language that is, I don't think anyone is arguing, it is language that is more restrictive than the language that was previously used in the statute. And that should mean something. Well, it's troubling just to try and think about the events here and how they were reflected in the legislation. It looks as if nothing has changed in that South Carolina is still the repository for substantial amounts of radioactive material, that an extremely ambitious and expensive project to reprocess that material has been abandoned, and that nothing really has changed from the initial situation which led to this legislation in the first place. And yet, on the one hand, we now see what looks like a total disclaimer of a legislated obligation that, at the time, I think was considered to be quite significant. And for the state to be told, we don't owe you anything, go away, doesn't seem to fit with any of the pattern of the public or private intent or understanding when this was begun. So what do we make of all that? Your Honor, the federal government and the Secretary of Energy have never told South Carolina to go away. What we have said is that their solution to their problem lies with Congress, which has not made appropriations available. We are not disputing that had Congress made appropriations available for this purpose, that the United States would be liable in the amount of that appropriations. The problem is that Congress, through both a lack of a specific appropriation for this purpose and the purpose restrictions it's placed on DOEs and appropriations, has demonstrated that it is not intent to have the Secretary make these appropriations. And unless and until Congress does so, the United States doesn't have liability under the statute and under our understanding of the subject to the availability appropriations conditioning language. Well, why wasn't there a ratification of the state's understanding of the arrangement of the legislation when the government did move one ton from South Carolina to Nevada? Well, I think if I understand your question, the removal of the one ton was in order to enforce the Secretary's obligations under subsection C of the statute. So the removal which referred to different timelines and different obligations than the obligations in subsection D, which referenced the impact and assistance payments. But it's still one contract. You're not saying that these were not deeply intertwined, all of these conditions in the document and the arrangement that was made, the arrangement that didn't work because the facility for reprocessing failed for whatever reason. This is all one contract, settlement of all one situation. And that is now however many years this is after the atomic energy product started, where are we to store these radioactive materials? Well, both subsection C and subsection D, the obligations there again relate to the MOCS production objective and... You're not saying that the statute didn't create an obligation to pay. You're just saying the statute by its own terms had an obligation to pay only if there was available appropriations. And you say Congress didn't appropriate the money, right? That's exactly it. We are not disputing, we have not, we've never disputed that the first condition that the MOCS production objective was not met by January 1, 2016 and still has not been met. We've never disputed that. The question is really looking at the appropriations that Congress has made and whether any of them are available for the purpose. But what's your answer to the argument of the state that this is just a line item and when you look at the magnitude of the defense budget, not a very big line item, and that appropriations aren't made item by item, that this was an obligation undertaken by the government, by statute, and the money is there within the department. It's a matter of allocating it to meet this contractual obligation with the state. Well, again, we... This is not a contractual obligation, Your Honor. It's a statutory one. Okay, a statutory obligation. That's even... But to more specifically answer your question, again, the problem that we have here is that Congress has restricted... Congress has not given DOE a lump sum amount that is unrestricted and may be used at DOE's discretion to meet its various obligations. It has very specifically limited both the purpose and the amount that may be used for any specific purpose. And the closest that South Carolina gets is to the material disposition control line, which again... So, for example, in 2016, Congress appropriated only $86 million for that entire program and that would clearly be insufficient to meet the $100 million that South Carolina government would otherwise be entitled to. That further demonstrates why it's not reasonable to read that control line as encompassing economic and assistance payments because it would completely swallow that control line. And given that DOE has to make yearly reports to Congress specifically about the MOCS program, whether the production objective is met, Congress is probably unusually aware and its oversight is unusually close in this particular program and in the nation's nonproliferation activities more generally. It's not reasonable to read that control line as covering these assistance payments in light of that unusual restriction that Congress has placed on DOE. Where does that control line appear in the record? The actual tables are found on pages 613 and 669 of the appendix. That's the 2016 and the 2017 appropriation acts. And where... Take 613, where's the control line here? So on page 613... Material management and minimization. Right. And then you further go down until... So that's the... And then that's the control line. And then each of the programs, projects, or activities that are underneath that include... I'm sorry. I'm still trying to find the page. But I think it includes, you know, the highly enriched uranium is the first line. And then there's nuclear material, and then there's the... I'm sorry. Let me just find the page and then I can more specifically answer the court's question. Okay. So, right. If the court looks at page 613... It's the material disposition line. Right. So you have material management and minimization is the... And then underneath those are the three. And then the third one is material disposition. And for that year, you can see that the amount that was appropriated for that program was $86.5 million for the material disposition. So the government's position is that this really is a political question that requires a political legislative remedy to... That the correct interpretation of that subject to appropriations is that the purported obligation need not be met if appropriations are not made, which takes us into acts of Congress in the political arena? I think what we're saying is two things. One is that the ultimate release that South Carolina is seeking is one that in light of the appropriations that have been made, it's a remedy that it needs to seek directly from Congress. I would have thought the answer to that question was yes. Well, I think the second answer is that to the extent that what South Carolina is asking the court to do is to wade into whether assistance payments further the nation's nonproliferation strategy or would help accomplish... No, they're not. They're just saying they had a deal. They have legislation and that they're entitled to have that statutory obligation fulfilled. That isn't very different from many suits against the government in the Court of Federal Claims, an obligation that may or may not have been met, not for the court to undertake the underlying policy determination. Right. And we agree that this court can decide a question by looking at the appropriations that have been made available and seeing if any of them are available for the purpose. And we believe that on the face, that the lack of a specific appropriation and the unique structure of the restrictions placed on the appropriations answers that question. I think our concern is to the extent that South Carolina is asking the court to look at a particular control line and see how much of that can be given to South Carolina in furtherance of this statutory obligation as opposed to other statutory and international obligations that the Department of Energy has to manage and dispose of weapons of mass grave material that really would get very close to wading into the waters that are reserved for Congress and for the executives. Ms. Hogan, this is Judge Wallach. Speaking of political questions, I'm curious whether there's any example of an agreement with which the Department of Energy or the United States has made with a state in order to get it to accept highly enriched uranium in which the program has been successful, the underlying disposal program. I do not know the answer to that question, Your Honor. Again, I think I'm not sure that the United States was required to have an agreement with South Carolina in order to store these materials at a federal facility. Again, I think that what was reached in the statute was a political assurance to the state. But to answer Your Honor's question directly, I don't know the answer to that. Okay. Any other questions for Ms. Hogan from the panel? Judge Wallach, no. Okay. All right. Thank you. Mr. Roberts, we assume you have your rebuttal time. Thank you, Your Honor. I want to hit on that last point from opposing counsel. They acknowledge that the reason these obligations were put into the statute was to reassure South Carolina that the plutonium would be moved out. It was done to obtain the state's acquiescence to this, at the time, preferred disposition policy. The record is undisputed on that. Now they're saying even though the obligations were put in place to further the disposition policy, when we come to enforce those obligations, they have absolutely no relationship to disposition. Counsel, this is Judge Wallach. I don't think your statement is actually correct. My understanding of what was done is that an agreement was made to build a facility which would, in effect, dilute the high enriched uranium and make it into something more palatable. And that the state of South Carolina accepted that in part because it was a benefit to the state to have a high tech facility located in South Carolina. Is that not correct? It wasn't about bringing it in and moving it out. I agree partially with that, Your Honor. There were two purposes with respect to South Carolina. One, you are correct. It was to get the benefit of the MODS facility, which if you look at the 2003 National Defense Authorization Act that enacted what ultimately became Section 2566, Congress outlines in Section 3181 the purposes of the statute. And there it recognizes for South Carolina, it wants the benefit of the MODS facility if it was built. But then there's another purpose, and it is to protect South Carolina and compensate South Carolina for having to store this plutonium within the state, especially if the deadlines of the statute are not met. That's why the assistance payment is put in there. It was the bait to get South Carolina to agree to all this. It's economic and impact assistance. And now we have come to enforce the statute, and they say there's no relationship to disposition. And to be clear, the government agrees that you have to look to see whether any of the appropriations available, that those purposes align with the economic and assistance payments. So it cannot just stop because Congress appropriated only at a program level, which they've done here and they often do. You have to drill down and look at an appropriation. And we have done that. We have pointed to the material disposition appropriation. The description of the material disposition appropriation doesn't seem to include this. If you look at page 598, which is the description of that. Well, there are two points to that. One is that description that's incorporated by Congress largely comes from the Department of Energy. Those specific items in the explanatory tables, the project programs and activities, the PPAs, that's largely derived from the budget request from the Department of Energy. So when you have... Well, that's true, but that doesn't... And that's at 776, but that doesn't mean that it's not informative as to what material management and minimization is. I agree, but what it also is informative is operative statute and Congress enacting and making an authorized function of the assistance payments. And that's what gets a little lost in the necessary expense doctrine. There's one where you look to see if the specific expenditure fits within the purposes, but the related part of that analysis is whether there is an authorized function which more general appropriations are available to meet. And here, through section 2566, Congress made the assistance payments an authorized function of the disposition program. Congress decided that. It's evident from the title of the statute, the purposes and the plain language that Congress made it an authorized function of that program. Now there are appropriations available for that program. And the law has never been, and it is not, that there has to be a specific appropriation here for that expenditure. That is the reason the necessary expense doctrine exists for this common situation. When you have a statutory obligation or some other expenditure for which there is not a specific line item appropriation, you go and make the determination whether there are other appropriations that this expenditure could be paid with. And those available appropriations are ones that can be made if, by making them, you do not violate the purpose statute. And the GAO, which this court, the Supreme Court, relies on an expert opinion, who is the expert in appropriations law, has laid out the test for when you can tell if something violates the purpose statute. And that is the necessary expense doctrine. You determine whether that appropriation has a logical or reasonable relationship to the expenditure. And then you also look to see, in the Appropriations Act, did Congress specifically restrict or prohibit the Department of Energy here from making those payments. And it did not. There is nothing in the Appropriations Act that specifically says, Department of Energy, you are not able to make those payments. You are not able to meet your 2566 obligations. And there were more than enough, each year, appropriations available in that material disposition program. If you count carryovers, which the government recognizes we can, for 2016, there was close to $170 million available in the material disposition program, after you specifically take into account the specific congressional earmarks or other restrictions. And then for $155 million available to the Department. And that is the question. Were the appropriations legally available to the Department to meet this statutory obligation? That is all the Section 2566 requires. And that has been met here. You cannot read into Section 2566 more language than what it says. It just says, Department of Energy, you have to make this payment if you have appropriations legally available to it. The Department here decided to ignore that. They decided not to tell Congress that they needed additional appropriations to make these payments, even knowing that obligations become due. And the undisputed record is, they did not tell Congress that the plutonium would not be removed from the issue. And that is what triggered the payments. So there is a clear reason here, based on the undisputed record, why Congress did not give a specific appropriation. But that does not end the inquiry. You have to go further. And I believe my time is up. It is. Any more questions for Mr. Roberts? No. Judge Wallach, no. Okay. Thank you. Thanks to both counsel. The case is taken under submission. Thank you. The Honorable Court is adjourned until tomorrow morning at 10 a.m.